IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

JOHNATHAN L. KVIDAHL,

    Plaintiff,

vs.

CAROLYN W. COLVIN,
Commissioner of Social Security,

    Defendant.

No. C14-0036

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

I.   INTRODUCTION ................................. 2

II.  PRINCIPLES OF REVIEW ......................... 2

III. FACTS ........................................ 4
     A. Kvidahl's Education and Employment Background ............. 4
     B. Administrative Hearing Testimony ....................... 4
        1. Kvidahl's Testimony ............................... 4
        2. Vocational Expert's Testimony ..................... 6
     C. Kvidahl's Medical History ............................. 8

IV.  CONCLUSIONS OF LAW .......................... 13
     A. ALJ's Disability Determination ....................... 13
     B. Objections Raised By Claimant ........................ 15
        1. Dr. Stientjes' Opinions .......................... 15
        2. Credibility Determination ........................ 16

V.   CONCLUSION .................................. 20

VI.  ORDER ....................................... 20

## I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 1) filed by Plaintiff Johnathan L. Kvidahl on March 20, 2014, requesting judicial review of the Social Security Commissioner's decision to deny his application for Title XVI supplemental security income ("SSI") benefits.[1] Kvidahl asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide him SSI benefits. In the alternative, Kvidahl requests the Court to remand this matter for further proceedings.

## II. PRINCIPLES OF REVIEW

Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the Commissioner's decision if supported by substantial evidence on the record as a whole." *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citation omitted). Substantial evidence is defined as "'less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion.'" *Id.* (quoting *Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010)); *see also Brock v. Astrue*, 674 F.3d 1062, 1063 (8th Cir. 2010) ("Substantial evidence is evidence that a reasonable person might accept as adequate to support a decision but is less than a preponderance.").

---

[1] On April 8, 2014, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

2

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011), the Eighth Circuit further explained that a court "'will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 556 (quoting *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008)). "'An ALJ's decision is not outside that zone of choice simply because [a court] might have reached a different conclusion had [the court] been the initial finder of fact.'" *Id.* Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have

decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## III. FACTS

### A. Kvidahl's Education and Employment Background

Kvidahl was born in 1986. He is a high school graduate. While in school, he was enrolled in special education courses due to a behavior disorder. In her decision, the ALJ determined that Kvidahl had no past relevant work. At the administrative hearing, however, Kvidahl stated that prior to 2006, he attempted part-time work as a restaurant dishwasher and busser, but could not continue in those jobs due to physical injuries.

### B. Administrative Hearing Testimony

#### 1. Kvidahl's Testimony

At the administrative hearing, Kvidahl discussed his physical impairments. He stated that he has difficulty running, jumping, and standing longer than 30 minutes due to knee pain. He further stated that "[w]alking does get hard after a while, like I can walk a few blocks but then it starts to get sore and my back starts to like give out."[2] He rated his knee pain at 3 on a scale of 0 to 10, with 10 being the greatest amount of pain. Kvidahl and his attorney also discussed his weight:

> Q: All right. And then what about your weight? Is, is that accurate, 5'11", 321?
> A: It was 321. The last weigh-in was 362. . . .
> Q: And how are you affected by your weight? Is it -- does it affect your ability to bend, stoop, kneel, squat?
> A: Yes. The, the heavier I am the worse my knee is, like I can't kneel because of the pain. I can't pivot because

---

[2] Administrative Record at 37.

4

     my knee might pop out. I can't jump. I can't run, those kinds of things.

(Administrative Record at 38.)

  Kvidahl also discussed his psychological impairments. He testified that he has difficulty concentrating due to ADHD. In describing his concentration problems, Kvidahl stated that "when I go to bed my mind races and I just skip from thought to thought. And another one is I'll start something and then I'll get bored with it right away so I'll go to do something else."[3] Kvidahl also testified that he has undergone outpatient treatment for substance abuse since 2011.

  Finally, Kvidahl's attorney asked Kvidahl about his ability to work:

> Q:  . . . What, what in your mind would prevent you from working full-time in any job?
> A:  Wanting -- not wanting to be around people mostly.
> Q:  What's the problem with being around people?
> A:  I just don't like being around people.
> Q:  What happens if you are?
> A:  It feels like everybody's judging me, like I --
> Q:  You think people are talking about you --
> A:  Yeah. . . . Like when people look at me and smile it's like they're laughing at me.
> Q:  Okay. And in the past is that what caused the outbreaks that you'd have where you'd --
> A:  Sometimes.
> Q:  -- go after people?
> A:  Sometimes. Mostly when I would go after people it was because I'm mad at them, like somebody would make me upset and that's how I chose to deal with it . . . to attack them. . . .
> Q:  Is it -- do you still have problems with control as far as --
> A:  Time to time, I do.
> Q:  -- outbreaks?

---

[3] *Id.* at 42.

5

> A: As long as I take my medicine I'm able to control myself a little bit better.
> Q: But you still have the problems with being around people --
> A: Yes.
> Q: -- regardless of the medicine or not?
> A: Yes.

(Administrative Record at 44-46.)

The ALJ also questioned Kvidahl. The ALJ inquired as to Kvidahl's daily activities. Kvidahal testified that:

> I wake up in the morning, eat breakfast, play videogames and watch TV. And then I meet with my worker usually on Tuesdays and Thursdays. I go to ASAC [(substance abuse treatment)] every two weeks to meet with my counselor and drop a UA [(urine drug test)]. Sometimes I hang out with my neighbor and help her around her house. But other than that I just sit at home because I don't want to go out in public.

(Administrative Record at 47.)

### 2. *Vocational Expert's Testimony*

At the hearing, the ALJ provided vocational expert Melinda Stahr with a hypothetical for an individual who:

> can occasionally lift and carry 50 pounds and could frequently lift and carry 25 pounds. This individual could stand or walk for six hours in an eight-hour day, . . . or sit for six hours in an eight-hour workday. He could occasionally climb ramps and stairs, ladders, ropes and scaffolds, balance, stoop, no kneeling, occasional crouching, no crawling.
>
> Further, this individual would be able to do only simple routine tasks . . . and he could have only short-lived superficial contact with the public, co-workers or supervisors.

(Administrative Record at 55-56.) The vocational expert testified that under such limitations, Kvidahl could perform the following jobs: (1) hand packager, (2) meat trimmer, and (3) spot welder. Next, the ALJ inquired:

> Q: And if I would change the limitation that the individual could only stand or walk for two hours in an eight-hour day, would that bring him all the way down to sedentary?
> A: It would.

(Administrative Record at 57.) The vocational expert identified three sedentary jobs that Kvidahl could perform: (1) touch-up screener, (2) circuit board table worker, and (3) document preparer.

Kvidahl's attorney also questioned the vocational expert:

> Q: If the hypothetical person had to work at a slow pace up to a third of the workday, would they be competitively employable?
> A: It's my professional opinion that they would not.
> Q: Okay. If the hypothetical person would not be able to maintain attention in two-hour segments, would they be competitively employable?
> A: It's my professional opinion that an individual does need to maintain attention for at least two hours to be competitively employable.
> Q: Okay. If the hypothetical person needed to take unscheduled work breaks, two or three each 20 to 30 minutes per break in addition to regularly scheduled breaks, would an employer allow for that extra absenteeism?
> A: It's my professional opinion that the unskilled, sedentary jobs that I listed, as well as the unskilled sort of manufacturing jobs that I listed in hypothetical number one, would be eliminated even with two unscheduled 20 minute breaks each day.

(Administrative Record at 58.)

(Administrative Record at 55-56.) The vocational expert testified that under such limitations, Kvidahl could perform the following jobs: (1) hand packager, (2) meat trimmer, and (3) spot welder. Next, the ALJ inquired:

> Q: And if I would change the limitation that the individual could only stand or walk for two hours in an eight-hour day, would that bring him all the way down to sedentary?
> A: It would.

(Administrative Record at 57.) The vocational expert identified three sedentary jobs that Kvidahl could perform: (1) touch-up screener, (2) circuit board table worker, and (3) document preparer.

Kvidahl's attorney also questioned the vocational expert:

> Q: If the hypothetical person had to work at a slow pace up to a third of the workday, would they be competitively employable?
> A: It's my professional opinion that they would not.
> Q: Okay. If the hypothetical person would not be able to maintain attention in two-hour segments, would they be competitively employable?
> A: It's my professional opinion that an individual does need to maintain attention for at least two hours to be competitively employable.
> Q: Okay. If the hypothetical person needed to take unscheduled work breaks, two or three each 20 to 30 minutes per break in addition to regularly scheduled breaks, would an employer allow for that extra absenteeism?
> A: It's my professional opinion that the unskilled, sedentary jobs that I listed, as well as the unskilled sort of manufacturing jobs that I listed in hypothetical number one, would be eliminated even with two unscheduled 20 minute breaks each day.

(Administrative Record at 58.)

## C. Kvidahl's Medical History

On December 29, 2009, at the request of Disability Determination Services ("DDS"), Kvidahl met with Dr. George T. Kappos, M.D., for a consultative examination. In reviewing Kvidahl's medical history, Dr. Kappos noted that:

> [Kvidahl] relates a history of an injury to his right knee in 2006. He states that he was told that he had a torn MCL in the knee. . . . He says that he was told that he probably should have surgery but because of his weight, surgery would not hold up, so nothing was done. He has had no treatment since that time and is not seeing anyone for the knee now. He complains of pain in his knee that is present fairly often, especially with activity. It can range from 0-10/10, with an average of 1-2/10. The pain is worsened by walking, standing and jumping and is relieved with Ibuprofen. He states that the knee gives him problems going up and down stairs, especially when going down stairs and with sudden movement.

(Administrative Record at 321.) Kvidahl also reported being diagnosed with explosive disorder, adult ADD, social anxiety, and depression. He stated that he is not currently being treated for his mental health problems. Dr. Kappos noted that Kvidahl's "symptoms are lack of sleep and emotional outbursts. He states that it is worse when he is in public."[4] Regarding physical limitations, Dr. Kappos opined that Kvidahl had: (1) no lifting or carrying restrictions; (2) no sitting restrictions; (3) a restriction on standing to four hours; (4) the ability to walk rarely; and (5) the ability to stoop, crawl, kneel, and climb stairs and ladders occasionally. Dr. Kappos also determined that Kvidahl "probably would have problems working in areas requiring following instructions or working with other people because of his mental illness problems."[5]

---

[4] Administrative Record at 321.

[5] *Id.* at 325.

8

On February 22, 2010, Dr. Rhonda Lovell, Ph.D., reviewed Kvidahl's medical records and provided DDS with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Kvidahl. On the Psychiatric Review Technique assessment, Dr. Lovell diagnosed Kvidahl with ADHD, major depressive disorder, general anxiety disorder with possible social anxiety disorder, personality disorder, and polysubstance dependence. Dr. Lovell determined that Kvidahl had the following limitations: mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Lovell found that Kvidahl was moderately limited in his ability to: maintain attention and concentration for extended periods, complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes. Dr. Lovell concluded that:

> [Kvidahl] appears to have a serious mental disorder that does not meet or equal a referenced listing. Based on high school completion and ADLs [(activities of daily living)], [Kvidahl] is able to understand and remember instructions and procedures for basic and detailed tasks. Concentration, per ADLs, is sufficient to carry out tasks when [Kvidahl] wishes to do so. [Kvidahl's] presentation and ADLs supported adequate interpersonal skills for at least limited, superficial interactions with others. According to treatment records, [Kvidahl's] disorder moderately disrupts his ability to regularly complete a typical work week. This assessment is consistent with the overall evidence of record.

(Administrative Record at 345.)

On April 21, 2011, Kvidahl was referred by DDS to Dr. Harlan J. Stientjes, Ph.D., for a psychological evaluation. In reviewing Kvidahl's symptoms, Dr. Stientjes noted that Kvidahl:

> reported that he dislikes himself, is restless and agitated, irritable, and cries easily. The impression is that he blames everyone else for his problems and is somewhat of a "whiner." He stated he fears losing control but it seems he makes little attempt to control himself and expects to "blow up" at the slightest provocation.

(Administrative Record at 392.) Upon examination, Dr. Stientjes diagnosed Kvidahl with major depressive disorder, ADHD, anti-social personality disorder, and polysubstance dependence. Dr. Stientjes opined that Kvidahl:

> can understand and remember simple oral and written instructions but is often inattentive and dependent upon prompts and cues from others. Interactions with others tend to be avoided; he is easily enraged. Safety judgment is minimally intact. He is not likely to respond well to supervision or the expectations of others.

(Administrative Record at 393.) Dr. Stientjes concluded that Kvidahl's "[p]rospects for sustained full-time gainful employment are comparatively poor."[6]

On April 27, 2011, at the request of DDS, Kvidahl met with Dr. Robert J. Schultes, M.D., for a consultative examination. In reviewing Kvidahl's medical history, Dr. Schultes noted that:

> On past medical history [Kvidahl] states that he can do the following. [He] can lift 50 pounds 8 hours per day. He can carry 20 pounds 2 hours per day due to knee pain. He can stand 2 hours per day due to knee pain. He can move about 8 hours per day. He can walk 10 blocks per day. He can sit 8 hours per day. He can stoop 8 hours per day. He cannot do any climbing secondary to knee pain and fear of heights. He

---

[6] Administrative Record at 393.

> cannot do any kneeling secondary to knee pain. He can crawl
> 8 hours per day. He can handle objects, see, hear, speak and
> travel 8 hours per day. He has no problems around dust or
> fumes. He cannot work in temperatures above 100 degrees
> Fahrenheit because his skin gets flushed, he gets short of
> breath and he has a dry mouth. He can work around other
> hazards.

(Administrative Record at 397.) Upon examination, Dr. Schultes diagnosed Kvidahl with chronic right knee pain, history of chronic low back pain, history of psychiatric disorders, obesity, and decreased range of motion and strength testing secondary to his other physical problems.

On May 10, 2011, Dr. Laura Griffith, D.O., reviewed Kvidahl's medical records and provided DDS with a physical RFC assessment for Kvidahl. Dr. Griffith determined that Kvidahl could: (1) occasionally lift and/or carry 50 pounds, (2) frequently lift and/or carry 25 pounds, (3) stand and/or walk with normal breaks for a total of about six hours in an eight-hour workday, (4) sit with normal breaks for a total of about six hours in an eight-hour workday, and (5) push and/or pull without limitations. Dr. Griffith also determined that Kvidahl could frequently climb, balance, stoop, kneel, crouch, and crawl. Dr. Griffith found no manipulative, visual, communicative, or environmental limitations.

On May 12, 2011, Dr. Scott Shafer, Ph.D., reviewed Kvidahl's medical records and provided DDS with a Psychiatric Review Technique and mental RFC assessment for Kvidahl. On the Psychiatric Review Technique assessment, Dr. Shafer diagnosed Kvidahl with ADHD, major depressive disorder, anti-social personality disorder, and polysubstance dependence. Dr. Shafer determined that Kvidahl had the following limitations: moderate restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Shafer found that Kvidahl was moderately limited in his ability to: understand and remember detailed instructions, carry out detailed

instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. Dr. Shafer concluded that:

> [Kvidahl] has a severe mental impairment that does not meet listing level. This is based on the following observations. [Kvidahl] was able to obtain and perform employment in the past until he injured his knee. There is limited evidence of treatment in record. [Examining Source] indicated some limitations, but none that would necessarily preclude employment. [Activities of daily living] indicate [Kvidahl] can participate in his daily responsibilities. The preponderance of evidence indicates [Kvidahl] retains the ability to perform simple tasks not requiring sustained attention with limited contact with others. [Kvidahl's] allegations are partially eroded by inconsistencies in record, lack of treatment, and continued use of alcohol with psychotropic medication.

(Administrative Record at 427.)

On July 5, 2012, Kvidahl was admitted to St. Luke's Hospital in Cedar Rapids, Iowa, for "increasing agitation and suicidality." Dr. Richard K. Larsen, M.D., found Kvidahl's symptoms to be consistent with primary psychotic disorder. At the time of discharge, Kvidahl's mood was "markedly" improved. He reported "feeling much better than he has in years."[7] Dr. Larsen diagnosed Kvidahl with schizophrenia, nocturnal enuresis, and borderline intellectual functioning. Dr. Larsen recommended medication as treatment.

---

[7] Administrative Record at 442.

## IV. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Kvidahl is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 416.920(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011); *Page v. Astrue*, 484 F.3d 1040, 1042 (8th Cir. 2007). The five steps an ALJ must consider are:

> (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (citing *Eichelberger*, 390 F.3d at 590); *Perks*, 687 F.3d at 1091-92 (discussing the five-step sequential evaluation process); *Medhaug v. Astrue*, 578 F.3d 805, 813-14 (8th Cir. 2009) (same); *see also* 20 C.F.R. §§ 404.1520(a)-(g), 416.920(a)-(g). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff*, 421 F.3d at 790, in turn quoting *Eichelberger*, 390 F.3d at 590-91).

In considering the steps in the five-step process, the ALJ:

> first determines if the claimant engaged in substantial gainful activity. If so, the claimant is not disabled. Second, the ALJ determines whether the claimant has a severe medical impairment that has lasted, or is expected to last, at least 12 months. Third, the ALJ considers the severity of the impairment, specifically whether it meets or equals one of the listed impairments. If the ALJ finds a severe impairment that meets the duration requirement, and meets or equals a listed impairment, then the claimant is disabled. However, the

> fourth step asks whether the claimant has the residual functional capacity to do past relevant work. If so, the claimant is not disabled. Fifth, the ALJ determines whether the claimant can perform other jobs in the economy. If so, the claimant is not disabled.

*Kluesner v. Astrue*, 607 F.3d 533, 537 (8th Cir. 2010). At the fourth step, the claimant "bears the burden of demonstrating an inability to return to [his] or her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden shifts to the Commissioner at step five to demonstrate that "given [the claimant's] RFC [(residual functional capacity)], age, education, and work experience, there [are] a significant number of other jobs in the national economy that [the claimant] could perform." *Brock*, 674 F.3d at 1064 (citing *Ellis v. Barnhart*, 392 F.3d 988, 993 (8th Cir. 2005)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 416.945. The ALJ bears the responsibility for determining "'a claimant's RFC based on all the relevant evidence including the medical records, observations of treating physicians and others, and an individual's own description of his [or her] limitations.'" *Boettcher v. Astrue*, 652 F.3d 860, 867 (8th Cir. 2011) (quoting *Moore*, 572 F.3d at 523); 20 C.F.R. § 416.945.

The ALJ applied the first step of the analysis and determined that Kvidahl had not engaged in substantial gainful activity since February 3, 2011. At the second step, the ALJ concluded from the medical evidence that Kvidahl had the following severe impairments: morbid obesity, diabetes, anti-social personality disorder, major depressive disorder, and a history of polysubstance abuse. At the third step, the ALJ found that Kvidahl did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Kvidahl's RFC as follows:

> [Kvidahl] has the residual functional capacity to perform medium work . . . in that he can occasionally lift and carry

> 50 pounds and 25 pounds frequently. He can stand or walk six
> hours of [an] 8-hour workday. He can sit six hours of an
> eight-hour workday. He can occasionally climb ramps and
> stairs, ladders, ropes, and scaffolds, balance, stoop, crouch.
> He should avoid kneeling and crawling. He is able to perform
> only simple, routine tasks[.] . . . He may have only short
> lived, superficial interaction with the public, coworkers and
> supervisors.

(Administrative Record at 15-16.) Also at the fourth step, the ALJ determined that Kvidahl had no past relevant work. At the fifth step, the ALJ determined that based on his age, education, previous work experience, and RFC, Kvidahl could work at jobs that exist in significant numbers in the national economy. Therefore, the ALJ concluded that Kvidahl was not disabled.

### B. Objections Raised By Claimant

Kvidahl argues that the ALJ erred in two respects. First, Kvidahl argues that the ALJ failed to properly evaluate the opinions of his examining psychologist, Dr. Stientjes. Second, Kvidahl argues that the ALJ failed to properly evaluate his subjective allegations of disability.

#### 1. Dr. Stientjes' Opinions

Kvidahl argues that the ALJ failed to properly evaluate the opinions of his examining psychologist, Dr. Stientjes. Specifically, Kvidahl argues that the ALJ's reasons for discounting Dr. Stientjes' opinions are not supported by substantial evidence in the record. Kvidahl concludes that this matter should be remanded for further consideration of Dr. Stientjes' opinions.

An ALJ is required to evaluate every medical opinion he or she receives from a claimant. 20 C.F.R. § 404.1527(d). If the medical opinion is not from a treating source, then the ALJ considers the following factors for determining the weight to be given to the non-treating medical opinion: "(1) examining relationship, (2) treating relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors." *Wiese*,

552 F.3d at 731 (citing 20 C.F.R. §§ 404.1527(d)). "'It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole.'" *Wagner*, 499 F.3d at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).

The ALJ addressed Dr. Stientjes' opinions as follows:

> The opinion of the one-time examining psychologist is given some weight but not great weight. The psychologist did not have available all of the evidence and inconsistencies now present before the undersigned which supports a slightly better functional capacity. The psychologist suggested [Kvidahl] would not likely respond well to supervisors or the expectations of others, yet [he] responded reasonably well to the expectations and directions of the psychologist. [Kvidahl] followed oral and written instructions. Treating and evaluating medical individuals have not persistently described [Kvidahl] as responding poorly to their directions during evaluations. As noted by the State Agency medical consultant psychologist, [Kvidahl] was able to follow oral instructions well according to [his] mother.

(Administrative Record at 19.)

Having reviewed the entire record, the Court finds that the ALJ properly considered and weighed the opinion evidence provided by Dr. Stientjes. The Court also finds that the ALJ provided "good reasons" for granting only "some" weight to Dr. Stientjes' opinions. *See* 20 C.F.R. § 404.1527(d)(2); *Strongson*, 361 F.3d at 1070; *Edwards*, 314 F.3d at 967. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. *Credibility Determination*

Kvidahl argues that the ALJ failed to properly evaluate his subjective allegations of disability. Kvidahl maintains that the ALJ's credibility determination is not supported by

substantial evidence. The Commissioner argues that the ALJ properly considered Kvidahl's testimony, and properly evaluated the credibility of his subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ should also consider a "a claimant's work history and the absence of objective medical evidence to support the claimant's complaints[.]" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (citing *Wheeler v. Apfel*, 224 F.3d 891, 895 (8th Cir. 2000)). The ALJ, however, may not disregard a claimant's subjective complaints "'solely because the objective medical evidence does not fully support them.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (quoting *Wiese v. Astrue*, 552 F.3d 728, 733 (8th Cir. 2009)).

Instead, an ALJ may discount a claimant's subjective complaints "if there are inconsistencies in the record as a whole." *Wildman*, 596 F.3d at 968; *see also Finch*, 547 F.3d at 935 (same); *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'make an express credibility determination, detailing the reasons for discounting the testimony, setting forth the inconsistencies, and discussing the Polaski factors.'" *Renstrom*, 680 F.3d at 1066 (quoting *Dipple v. Astrue*, 601 F.3d 833, 837 (8th Cir. 2010)); *see also Ford*, 518 F.3d at 982 (An ALJ is "required to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' *Lewis v. Barnhart*,

353 F.3d 642, 647 (8th Cir. 2003)."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (providing that deference is given to an ALJ when the ALJ explicitly discredits a claimant's testimony and gives good reason for doing so); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Vossen v. Astrue*, 612 F.3d 1011, 1017 (8th Cir. 2010) (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1218 (8th Cir. 2001)).

In her decision, the ALJ determined that:

> [Kvidahl] had some findings consistent with pain but other objective findings and admissions [were] not consistent with disabling pain. [Kvidahl's] admissions of being able to lift 50 pounds 8 hours per day and his admission that he was able to move about 8 hours per day are supportive of the functional capacity assigned to [Kvidahl] by the undersigned. Other objective findings such as [Kvidahl's] normal station and gait, normal strength, and ability to squat and walk on his toes are inconsistent with the presence of a significant knee problem. The record elsewhere establishes no persistent treatment for alleged knee or other physical problems. On July 16, 2012, [Kvidahl] denied myalgias and arthralgias or weakness. In light of the evidence and some inconsistencies, [Kvidahl's] allegations are found supported only as reflected in the functional capacity assigned to [him] by the undersigned.

(Administrative Record at 17.) The ALJ further determined that:

> [Kvidahl] testified at the hearing that he was limited in his ability to walk and be on his feet. Pain in his knee was alleged to a level 3 on a normal basis. [His] description of his pain is

18

> not consistent with a severe or disabling degree of pain. [He] indicated he did not have a problem with stairs.
>
> [Kvidahl] alleged getting mad and losing control, but the medical evidence does not indicate significant episodes occurring after the date he filed his application.
>
> [He] testified his mother helped him keep on track and helps remind him to take his medication. . . .
>
> Medications have been effective in reducing or controlling symptoms when used appropriately. There are no side effects of medications credibly established which have lasted for a 12 month continuous period despite attempts at adjustment or substitution[.] . . .
>
> Based on the above discussion and inconsistencies in the record as a whole, [Kvidahl's] allegations . . . concerning the existence, persistence and intensity of symptoms and functional limitations are not given full weight or credibility, but only such as reflected in the residual functional capacity assigned by the undersigned.

(Administrative Record at 20.)

It is clear from the ALJ's decision that she thoroughly considered and discussed Kvidahl's treatment history, medical history, functional abilities, effectiveness of medications, and activities of daily living in making her credibility determination. Thus, having reviewed the entire record, the Court finds that the ALJ adequately considered and addressed the *Polaski* factors in determining that Kvidahl's subjective allegations of disability were not credible. *See Johnson*, 240 F.3d at 1148; *see also Goff*, 421 F.3d at 791 (an ALJ is not required to explicitly discuss each *Polaski* factor, it is sufficient if the ALJ acknowledges and considers those factors before discounting a claimant's subjective complaints); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each *Polaski* factor as long as the analytical framework is recognized

and considered. *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996)."). Accordingly, because the ALJ seriously considered, but for good reasons explicitly discredited Kvidahl's subjective complaints, the Court will not disturb the ALJ's credibility determination. *See Johnson*, 240 F.3d at 1148. Even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

## V. CONCLUSION

The Court finds that the ALJ properly considered and weighed the opinion evidence provided by Kvidahl's examining psychologist, Dr. Stientjes. The Court also finds that the ALJ properly determined Kvidahl's credibility with regard to his subjective allegations of disability. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VI. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;

2. Plaintiff's Complaint (docket number 1) is **DISMISSED** with prejudice; and

3. The Clerk of Court is directed to enter judgment accordingly.

DATED this 8th day of January, 2015.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA